UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-150 (NEB/BRT)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GREGORY LYNN MCCOY,

        Defendant.

**GOVERNMENT'S RESPONSE TO MCCOY'S PRETRIAL MOTIONS**

The United States of America, by and through its undersigned attorneys, respectfully submits the following consolidated response to the pretrial motions of Gregory Lynn McCoy.

1. Government's Response to McCoy's "Motion for Discovery" (ECF No. 18).

The government has made its Rule 16 disclosures (which were substantial) and will continue to supplement its disclosures as additional Rule 16 materials, if any, come into its possession. The government does not oppose McCoy's "Motion for Discovery" to the extent that it requires the government to continue to comply with its Rule 16 obligations in this case, but opposes the motion to the extent that it seeks to impose discovery obligations upon the government that exceed those imposed by Rule 16.

2. Government's Response to McCoy's "Motion for Release of Brady Materials" (ECF No. 19).

The government understands, has complied with, and will continue to comply with, its *Brady* and *Giglio* obligations to produce exculpatory/impeachment evidence to McCoy.

If any additional such evidence comes to the government's attention, it will be turned over promptly, and sufficiently before trial to enable the defendant to make effective use of it.

3. Government's Response to McCoy's "Motion to Retain Rough Notes" (ECF No. 20).

Without conceding their discoverability, the government does not oppose McCoy's "Motion to Retain Rough Notes."

4. Government's Response to McCoy's "Motion for Disclosure of Rule 404(b) Evidence (ECF No. 21).

With respect to Rule 404(b) evidence, the government will provide a notice to McCoy "of the general nature of any such evidence that the prosecutor intends to offer at trial" no later than two weeks prior to trial, or at a time set by the Court. See Rule 404(b)(3)(A).

5. Government's Response to McCoy's "Motion for Early Disclosure of Jencks Material" (ECF No. 22).

The government opposes this motion. The entire thrust of the Jencks act is to relieve the government of any obligation to turn over witness statements until the witness has testified on direct examination. In accordance with its office policy, the government volunteers to turn over its Jencks Act materials not later than three days before trial.

6. Government's Response to McCoy's "Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment" (ECF No. 23) and to McCoy's "Motion for Hearing Pursuant to *Franks v. Delaware*" (ECF No. 24).

McCoy argues in his suppression motions that a search warrant executed at a residence on Sheridan Avenue North (the "Sheridan House") on October 22, 2019 was so facially invalid that its derivative fruits should be suppressed. McCoy asks for a *Franks*

2

hearing to shore up this argument. For the reasons that follow, both motions should be denied.

## Background

On October 15, 2009, Hennepin County Deputy Sheriff Jeff Marshall swore out a search warrant application for the Sheridan House, seeking authorization to search it for guns and drugs. Defense Exhibit A consists of the search warrant application, including Marshall's supporting affidavit, and the warrant issued by the Hennepin County District Court granting the warrant application.[1]

The probable cause set forth in Marshall's affidavit, as relevant to McCoy, can be summarized as follows (all information summarized below is from Defense Exhibit A):

1. Sometime in the two weeks that preceded Deputy Marshall's meeting with the issuing Hennepin County District Court Judge, a confidential reliable informant ("CRI") informed Marshall that a person named "Greg" was a cocaine and marijuana dealer who used a handgun for protection.

2. The CRI told Marshall that "Greg" used a cell phone with a phone number ending in 0114.

---

[1] McCoy has sought to seal this and the other exhibits to his motions to suppress because of the "home addresses and other identifying information" contained in them. This is a rather unusual sealing request. Federal Rule of Criminal procedure 49.1(a) provides that redaction by the filing party is the proper remedy for protecting the personally-identifying information ("PII") found in the defendant's exhibits. The public has an interest in the minimization of the outright sealing of documents when redaction will suffice to protect PII from undue disclosure.

3. Marshall consulted the "Clear" website[2] and discovered that a person named "Gregory Lynn McCoy" was "related to" the phone number ending in 0114.

4. Marshall looked up "Gregory Lynn McCoy" on the nonpublic DVS website, which stores everybody's driver's license pictures, and printed out McCoy's driver's license picture.

5. The CRI identified the person in the picture as the "Greg" who was dealing drugs and using a handgun for protection.

6. Marshall then used the DVS website to determine a possible address for McCoy, and discovered that McCoy had a 2002 Chevrolet Blazer titled in his name which was "registered to" the address of the Sheridan House.

7. Marshall personally observed the 2002 Chevrolet Blazer parked in front of the Sheridan House "several times." The timing of the investigative steps compels the conclusion that Marshall observed the Blazer at the Sheridan House "several times" in the two-week period preceding the issuance of the warrant.

8. Marshall then relates that the CRI reported that McCoy "stays with" another male known as "Pumpkin," who drives a black Range Rover.

9. Marshall observed and photographed a black Range Rover parked in the rear of the Sheridan House, and the CRI, upon looking at the photograph, related that the

---

[2] The "Clear" database is a service offered by Thompson Reuters, often subscribed to by law enforcement, that provides information about individuals based upon phone numbers, addresses, and a myriad of other information. It is particularly useful in identifying persons who might be associated with phone numbers, including cell phone numbers.

    Range Rover in the picture looked identical to "Pumpkin's"

    black Range Rover.

10. The CRI told Marshall that "Pumpkin" used a cell phone with a phone number ending in 2077. Marshall "researched" this phone number and "learned" that the phone number was "listed to" John Turnage.

11. Marshall pulled a picture of Turnage from the DVS website, and the CRI identified Turnage as "Pumpkin."

12. In the 72-hour period preceding the issuance of the warrant, Marshall arranged for the CRI to make a controlled buy of marijuana from Turnage at a pre-arranged meeting spot. Law enforcement saw Turnage leave the Sheridan House, go "directly" to the meeting spot, sell marijuana to the CRI at the meeting spot, and then immediately return "directly" to the Sheridan House.

    Marshall and other law enforcement officers, including the Minneapolis Police Department SWAT team, executed the warrant at the Sheridan House on October 22, 2019. The warrant's execution led Marshall to believe that McCoy stored narcotics or guns in a red Dodge Durango (the "Red Truck") registered to McCoy which was present at the Sheridan House during the execution of the warrant.

    Consequently, Marshall swore out a second search warrant before a different Hennepin County District Court Judge, this time for the Red Truck, on October 23, 2019. The firearm charged in the indictment was found in the Red Truck. A copy of the warrant application, including Marshall's supporting affidavit, and the warrant itself, is appended to this pleading, with redactions for PII, as Government Exhibit 1. The probable cause set

forth in Marshall's affidavit, as relevant to McCoy and the search of the Red Truck, can be summarized as follows (all information summarized below is from Government Exhibit 1):

1. The following events occurred prior to entry into the Sheridan House:

   a. Members of the Violent Offender Task Force ("VOTF") (Marshall is a VOTF member) set up surveillance on the Sheridan House.

   b. The VOTF observed McCoy arrive in the Red Truck, and go directly into the Sheridan House.

   c. Shortly thereafter (it's not in the affidavit, but exactly one hour after McCoy's arrival), the Minneapolis SWAT team entered the Sheridan House. McCoy had not left the Sheridan House since arriving in the Red Truck and going directly inside. Upon making entry, Minneapolis SWAT officers observed McCoy throwing a baggie of suspected cocaine into an open closet. The suspected cocaine field tested positive for the presence of cocaine.

   d. Marshall brought in a K9 to sniff the Red Truck. The K9 "alerted" to the presence of narcotics at the passenger door of the Red Truck.

The charged firearm was located in the center console of the truck, along with three magazines fully-loaded with ammunition, one of which contained McCoy's DNA.

<u>Argument</u>

McCoy appears to argue that Marshall obtained the warrant for the Sheridan House by deliberately misleading the issuing judge into believing that there was a nexus

6

between the Sheridan House and drug dealing. The warrant for the Red Truck, he argues, is the poisonous fruit of the warrant for the Sheridan House. McCoy asks for a *Franks* hearing to develop his suppression arguments.

McCoy's suppression motion should be denied and McCoy has not even come close to establishing his entitlement to a *Franks* hearing.

    A.  <u>The Warrants for the Sheridan House and the Red Truck are Supported by Abundant Probable Cause</u>.

The warrant affidavit tells a very simple, real-time story, supported by the personal observations arising out of Marshall's surveillance activities. A CRI (with a history of corroborated reliability) tells Marshall about a person named "Greg" who is dealing drugs and carrying a firearm, and provides Marshall with the 0114 phone number. Using the "Clear" website, Marshall discovers that a person named "Greg" was associated with the phone number – namely, Gregory Lynn McCoy. Marshall prints McCoy's driver's license picture from DVS, and the CRI identifies McCoy as "Greg."

At this point, Marshall has identified Gregory Lynn McCoy as the CRI's "Greg." Marshall then identifies, through DVS, a 2002 Chevrolet Blazer that McCoy has registered to the address of the Sheridan House. "Through physical surveillance, your affiant has seen this vehicle parked in front of [the Sheridan House] several times."

As well, the CRI twlls Marshall about "Pumpkin," another person who deals drugs with the help of a firearm, who is thought to be "staying with" McCoy. Marshall identifies Pumpkin as John Turnage using a cell phone number. The CRI reports that Pumpkin drives a black Range Rover, and Marshall tells the issuing judge that he had

7

observed "in the last week" a black Range Rover parked in back of the Sheridan House, which the CRI identifies as Pumpkin's vehicle (from a photo taken by Marshall).

To firmly tie drug dealing with the Sheridan House, Marshall then arranges for the CRI to do a controlled purchase of drugs from Turnage. The controlled purchase occurs "within . . . 72 hours" of the issuance of the warrant. Turnage goes directly to the meet spot from the Sheridan House and, after the controlled delivery, returns directly to the Sheridan House. A strong, fresh nexus now ties the Sheridan House to the drug dealing activities of Turnage.

The SWAT team therefore legally entered the Sheridan House, and were legally present inside the Sheridan House, when SWAT team members saw McCoy throwing a "baggie of suspected cocaine" into an open closet (which field tested positive for cocaine). McCoy had just arrived in the Red Truck, and had just gone directly into the Sheridan House from the Red Truck, when officers saw McCoy throwing drugs into the closet. A drug canine then alerted on the Red Truck. Marshall obtained a second warrant for the Red Truck, which yielded the charged gun and three magazines.

The probable cause supporting the warranted searches of the Sheridan House and of the Red Truck is fresh, strong, and rooted in common sense.

B. McCoy's *Franks* Arguments Do not Justify a *Franks* Hearing, Much Less Suppression.

McCoy contends that Marshall deliberately or recklessly concealed information from the issuing judge that would have, if disclosed, rendered "[in]sufficient [the] nexus

8

between the alleged criminal activity and the Sheridan Avenue North Residence." ECF No 25, p. 6.

A defendant seeking a *Franks* hearing must make a "substantial preliminary showing." *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004). "[T]o merit a Franks hearing, [a defendant] must show both (1) that the affiant [] 'knowingly and intentionally' made false statements or made them in 'reckless disregard for the truth' and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). "'The requirement of a substantial preliminary showing is not lightly met.'" Id. (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)). And "[m]ere allegations of deliberate or reckless falsehoods are insufficient." Id. at 899. Accordingly, *Franks* only "protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate," *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (emphasis in original) (citing *United States v. Reivich*, 793 F.3d 957, 961 (8th Cir. 1986)).

Here, none of the purported material omissions could reasonably be deemed to have been "designed to mislead" the magistrate. The government takes the asserted omissions one at a time.

    1.    <u>The Cell Phone Number Ending in 0114</u>.  Marshall used this CRI-provided cell phone number to identify the person the CRI knew as "Greg."  Using "Clear," Marshall determined that a Gregory Lynn McCoy was "related to" this cell phone number, prompting him to print McCoy's driver's license picture from DVS and prompting, in turn,

9

the CRI to identify McCoy as his/her "Greg." Marshall misled nobody by averring that McCoy was "related to" this number. Marshall swore that McCoy was "related to" this phone number, and the phone number obviously did "relate to" McCoy because it enabled Marshall to find and print McCoy's driver's license photo to show to the CRI. That other people may also have been "related to" the number does not change, undermine or taint Marshall's effective use of the number to identify McCoy as the "Greg" mentioned by the CRI. Further, the process of using the phone number to identify McCoy as the CRI's "Greg" has little to do with the probable cause to believe that the Sheridan House was being used for drug dealing, which was developed after the CRI's identification of McCoy as "Greg."

      2.      <u>The DVS Records</u>. McCoy criticizes Marshall for not telling the issuing judge that McCoy's driver's license contained an address in North St. Paul; or that Turnage's driver's license contained an address on Kent Street in Roseville; or that Turnage's Range Rover was registered to a woman living on Tyler Street in Minneapolis. "The available information actually made the question of where Mr. McCoy and Mr. Turnage lived an open question," argues McCoy. ECF No 25, p. 5.

Marshall did not mislead the issuing judge. The purpose of Marshall's affidavit was not to establish where McCoy and Turnage lived, but rather to show that McCoy and Turnage were using the Sheridan House to deal dope. Probable cause did not turn on either man living at in the Sheridan House, and Marshall did not swear that either man did. Instead, Marshall stuck to the facts known to him, namely, that McCoy's Blazer was registered to the Sheridan House, and Marshall had seen it parked there several times; that

10

Marshall had observed Turnage's Range Rover parked at the Sheridan House; and that Turnage left from and returned to the Sheridan House to sell drugs to the CRI within 72 hours of the warrant's issuance. The entirely unsurprising fact that DVS data showed that both McCoy and Turnage had had connections with other address is not information Marshall had a duty to relate to the issuing judge, and the failure to do so was not in any way misleading. A "law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Arnold*, 725 F.3d at 898-99 (citing *Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001)).

Finally, the warrant for the Sheridan House would still be supported by ample probable cause to search it for drugs and guns, even if Marshall's assertedly misleading discussion of the DVS records and the cell-phone records were removed from Marshall's affidavit. The general information about McCoy and Turnage provided by the reliable informant, coupled with the controlled sale by Turnage to the CRI within 72 hours of the warrant's issuance, in the course of which Turnage left from and returned to the Sheridan House, provides strong, probable cause support to the warrant, even without the discussion of the DVS and cell phone records. Here, because Marshall's affidavit contains plenty of probable cause to search the Sheridan House, even deleting the information McCoy asserts is misleading, there can be no Fourth Amendment violation, and the defendant has failed to make the requisite substantial preliminary showing to warrant a *Franks* hearing.

Accordingly, the defendant's motions to suppress, and for a *Franks* hearing, should be denied.

Dated: September 8, 2020

ERICA H. MacDONALD
United States Attorney

*s/ David J. MacLaughlin*

BY: DAVID J. MacLAUGHLIN
JOSEPH S. TEIRAB
Assistant U.S. Attorneys