UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-150 (NEB/BRT)

UNITED STATES OF AMERICA,

        Plaintiff,

                           **GOVERNMENT'S SECOND**
                           **RESPONSE TO MCCOY'S**
     v.                        **PRETRIAL MOTIONS**

GREGORY LYNN MCCOY,

        Defendant.

The United States of America, by and through its undersigned attorneys, respectfully submits its second consolidated response to the pending pretrial motions of Gregory Lynn McCoy.

1. **Government's Response to McCoy's "Motion for Disclosure of Grand Jury Transcript" (ECF No. 52).**

The government will produce, as Jencks and Rule 26.2 material, the grand jury transcript of any witness it intends to call at the motions hearing or at trial. However, the government objects to producing the transcript in advance of the witness's testimony, except to the extent provided for in the government's response to the defendant's Motion for Early Disclosure of Jencks Act Material (ECF No. 79).[1]

---

[1] *See* ¶ 8 below.

**2.**   **Government's Response to McCoy's "Motion for Leave to File Later Motions for Good Cause" (ECF No. 53).**

The government opposes this motion as premature. All discovery has been provided in this case and McCoy should file any pertinent motions in advance of the motions hearing. If, after the motions hearing, McCoy discovers additional grounds for filing another motion, he should seek leave from the Court to do so at that time.

**3.**   **Government's Response to McCoy's "Motion for Counsel to Participate in Voir Dire" (ECF No. 55).**

The government opposes this motion. The motion is premature in that it should be submitted to the trial judge prior to trial. The government defers to the practice of the trial judge in determining the manner of voir dire.

**4.**   **Government's Response to McCoy's "Motion for Discovery" (ECF No. 70).[2]**

The government has made its Rule 16 disclosures (which were substantial) and will continue to supplement its disclosures as additional Rule 16 materials, if any, come into its possession. The government does not oppose this motion to the extent that it requires the government to continue to comply with its Rule 16 obligations in this case, but opposes the motion to the extent

---

[2] McCoy's "Motion for Discovery" (ECF No. 70) is substantively identical to his motion previously filed as ECF No. 18, to which the government responded in ECF No. 29.

that it seeks to impose discovery obligations upon the government that exceed those imposed by Rule 16.

5. **Government's Response to McCoy's "Motion for Release of Brady Materials" (ECF No. 71).**[3]

The government understands, has complied with, and will continue to comply with, its *Brady* and *Giglio* obligations to produce exculpatory and impeachment evidence to McCoy. If any additional such evidence comes to the government's attention, it will be turned over promptly, and sufficiently before trial to enable the defendant to make effective use of it.

6. **Government's Response to McCoy's "Motion for Disclosure of Rule 404(b) Evidence" (ECF No. 72).**[4]

With respect to Rule 404(b) evidence, the government will provide a notice to McCoy "of the general nature of any such evidence that the prosecutor intends to offer at trial" no later than two weeks prior to trial, or at a time set by the Court. *See* Rule 404(b)(3)(A).

7. **Government's Response to McCoy's "Motion to Retain Rough Notes" (ECF No. 73).**[5]

Without conceding their discoverability, the government does not oppose McCoy's "Motion to Retain Rough Notes."

---

[3] This motion is substantively identical to McCoy's motion previously filed as ECF No. 19, to which the government responded in ECF No. 29.

[4] This motion is substantively identical to McCoy's motion previously filed as ECF No. 21, to which the government responded in ECF No. 29.

[5] This motion is substantively identical to McCoy's motion previously filed as ECF No. 20, to which the government responded in ECF No. 29.

8. **Government's Response to McCoy's "Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment" (ECF No. 74) and to McCoy's "Motion for Hearing Pursuant to *Franks v. Delaware*" (ECF No. 75, 76).**

McCoy generally argues in his suppression motions that a search warrant executed at a residence on Sheridan Avenue North (the "Sheridan House") on October 22, 2019, and a search warrant executed on a red Dodge Durango SUV ("Red SUV") on October 23, 2019, lacked probable cause, thereby justifying suppression of derivative evidence. McCoy claims the warrant was not sufficiently particular. McCoy also asks for a *Franks* hearing. For the reasons that follow, these motions should be denied.

<u>Background</u>

On October 15, 2019, Hennepin County Sheriff's Office ("HCSO") Deputy Jeff Marshall swore out a search warrant application for the Sheridan House, seeking authorization to search it for guns and drugs. Defense Exhibit A (ECF No. 83) consists of the search warrant application for the Sheridan House, including Marshall's supporting affidavit, and the warrant issued by the Hennepin County District Court granting the warrant application.

The probable cause set forth in Marshall's affidavit regarding the Sheridan House, as relevant to McCoy, can be summarized as follows (all information summarized below is from ECF No. 83, Defense Exhibit A):

1. Sometime in the two weeks that preceded Deputy Marshall's meeting with the issuing Hennepin County District Court Judge, a CRI informed Marshall that a person named "Greg" was a cocaine and marijuana dealer who used a handgun for protection.

2. The CRI told Marshall that "Greg" used a cell phone with a phone number ending in 0114.

3. Marshall consulted the "Clear" website[6] and discovered that a person named "Gregory Lynn McCoy" was "related to" the phone number ending in 0114.

4. Marshall looked up "Gregory Lynn McCoy" on the nonpublic DVS website, which stores everybody's driver's license pictures, and printed out McCoy's driver's license picture.

5. The CRI identified the person in the picture as the "Greg" who was dealing drugs and using a handgun for protection.

6. Marshall then used the DVS website to determine a possible address for McCoy, and discovered that McCoy had a 2002 Chevrolet Blazer titled in his name which was "registered to" the address of the Sheridan House.

---

[6] The "Clear" database is a service offered by Thompson Reuters, often subscribed to by law enforcement, that provides information about individuals based upon phone numbers, addresses, and a myriad of other information. It is particularly useful in identifying persons who might be associated with phone numbers, including cell phone numbers.

7.  Marshall personally observed the 2002 Chevrolet Blazer parked in front of the Sheridan House "several times."   The timing of the investigative steps compels the conclusion that Marshall observed the Blazer at the Sheridan House "several times" in the two-week period preceding the issuance of the warrant.

8.  Marshall then relates that the CRI reported that McCoy "stays with" another male known as "Pumpkin," who drives a black Range Rover.

9.  Marshall observed and photographed a black Range Rover parked in the rear of the Sheridan House, and the CRI, upon looking at the photograph, related that the Range Rover in the picture looked identical to "Pumpkin's" black Range Rover.

10. The CRI told Marshall that "Pumpkin" used a cell phone with a phone number ending in 2077.  Marshall "researched" this phone number and "learned" that the phone number was "listed to" John Turnage.

11. Marshall pulled a picture of Turnage from the DVS website, and the CRI identified Turnage as "Pumpkin."

12. In the 72-hour period preceding the issuance of the warrant, Marshall arranged for the CRI to make a controlled buy of marijuana from Turnage at a pre-arranged meeting spot.   Law enforcement saw Turnage leave the Sheridan House, go "directly" to the meeting spot,

sell marijuana to the CRI at the meeting spot, and then immediately return "directly" to the Sheridan House.

Marshall and other law enforcement officers, including the Minneapolis Police Department SWAT team, executed the warrant at the Sheridan House on October 22, 2019. At the time he swore out the affidavit, Marshall believed the Sheridan House to be a single-family dwelling, because 1) the external appearance was consistent with a single-family dwelling, to include only one visible gas-meter, and 2) Marshall searched the Sheridan House address on a public database, which revealed that it was a single-family dwelling.

The probable cause set forth in Marshall's affidavit regarding the Red SUV, as relevant to McCoy, can be summarized as follows (all information summarized below is from ECF No. 80, Defense Exhibit E):

1.  On October 22, 2019, members of the Violent Offender Task Force ("VOTF") (Marshall is a VOTF member) set up surveillance on the Sheridan House.

2.  The VOTF saw the Red SUV pull up to the Sheridan House. The Red SUV "registered to" McCoy and McCoy appeared to be the driver. McCoy went directly into the Sheridan House from the Red SUV.

3. Shortly thereafter,[7] the Minneapolis SWAT team entered the Sheridan House.  McCoy had not left the Sheridan House since arriving in the Red SUV and going directly inside.  Upon making entry, Minneapolis SWAT officers saw McCoy throwing a baggie of suspected cocaine into an open closet.[8]  The suspected cocaine field tested positive for the presence of cocaine.

4. Marshall brought in a certified dog to sniff the Red SUV.  The dog "alerted" to the presence of narcotics.

5. The Red SUV was towed to the HCSO, where it was secured.

6. Marshall noted in the affidavit that, from his training and experience, it is common for suspects involved in narcotics distribution to hide illegal narcotics and/or firearms in vehicles.

Consequently, Marshall swore out a second search warrant before a different Hennepin County District Court Judge, this time for the Red SUV, on October 23, 2019. The firearm charged in the indictment was found in the Red SUV.  The charged firearm was located in the center console, along with

---

[7] Though not in the affidavit, the entry was exactly one hour after McCoy's arrival.

[8] Though not in the affidavit, the Minneapolis SWAT officers were located in a Sheridan House common area (living room/hallway) when they saw McCoy throw the baggie of suspected cocaine.

three magazines fully-loaded with ammunition, one of which contained McCoy's DNA.

Argument

McCoy argues that probable cause to search both the Sheridan House and the Red SUV was lacking. He argues there was minimal or no nexus between himself and the Sheridan House/Red SUV, and between criminality and the Sheridan House/Red SUV. McCoy also appears to argue that Marshall obtained the warrants by deliberately misleading the issuing judge into believing that there was a nexus between the Sheridan House and drug dealing. The warrant for the Red SUV, he argues, is the poisonous fruit of the warrant for the Sheridan House. McCoy also claims that the warrant was not sufficiently particular. McCoy asks for a *Franks* hearing to develop his suppression arguments.

McCoy's suppression motions should be denied. McCoy has not come close to establishing his entitlement to a *Franks* hearing.

A. The Warrants for the Sheridan House and the Red SUV are Supported by Abundant Probable Cause.

In reviewing an application for a search warrant, the reviewing magistrate is to make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *Illinois v. Gates*, 462 U.S. 213, 214 (1983). A court reviewing the magistrate's decision must only "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id*.

The warrant affidavits tell a very simple, real-time story, supported by the personal observations arising out of Marshall's surveillance activities. A CRI (with a history of corroborated reliability) tells Marshall about a person named "Greg" who is dealing drugs and carrying a firearm, and provides Marshall with the 0114 phone number. Using the "Clear" website, Marshall discovers that a person named "Greg" was associated with the phone number – namely, Gregory Lynn McCoy. Marshall prints McCoy's driver's license picture from DVS, and the CRI identifies McCoy as "Greg."

At this point, Marshall has identified Gregory Lynn McCoy as the CRI's "Greg." Marshall then identifies, through DVS, a 2002 Chevrolet Blazer that McCoy has registered to the address of the Sheridan House. "Through physical surveillance, your affiant has seen this vehicle parked in front of [the Sheridan House] several times."

As well, the CRI tells Marshall about "Pumpkin," another person who deals drugs with the help of a firearm, who is thought to be "staying with" McCoy. Marshall identifies Pumpkin as John Turnage using a cell phone number. The CRI reports that Pumpkin drives a black Range Rover, and Marshall tells the issuing judge that he had observed "in the last week" a black

Range Rover parked in back of the Sheridan House, which the CRI identifies as Pumpkin's vehicle (from a photo taken by Marshall).

To firmly tie drug dealing with the Sheridan House, Marshall then arranges for the CRI to do a controlled purchase of drugs from Turnage. The controlled purchase occurs "within . . . 72 hours" of the issuance of the warrant. Turnage goes directly to the meet spot from the Sheridan House and, after the controlled delivery, returns directly to the Sheridan House. A strong, fresh nexus now ties the Sheridan House to the drug dealing activities of Turnage.

The SWAT team therefore legally entered the Sheridan House, and were legally present inside the Sheridan House, when SWAT team members saw McCoy throwing a "baggie of suspected cocaine" into an open closet (which field tested positive for cocaine). McCoy had just arrived in the Red SUV and had just gone directly into the Sheridan House from the Red SUV when officers saw McCoy throwing drugs into the closet. A drug dog then alerted on the Red SUV. Marshall obtained a second warrant for the Red SUV, which yielded the charged gun and three magazines.

The probable cause supporting the warranted searches of the Sheridan House and of the Red SUV is fresh, strong, and rooted in common sense. Courts have found probable cause in factually similar cases in which an individual leaving and/or returning to a residence after a controlled buy provided a sufficient nexus to that residence. *See, e.g., O'Neil v. United States*,

966 F.3d 764, 771-772 (8th Cir. 2020) (finding probable cause to search an apartment where affidavit included an informant's tip that a woman and man sold drugs out of an apartment, and a woman entered an apartment after the controlled buy); *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) (upholding probable cause because "[t]he [search warrant] affidavit explained that a confidential informant had observed someone come out of [the defendant's] residence, engage in a drug transaction, and then return into the residence."); *States v. Barnes*, 492 F.3d 37 (1st Cir. 2007) (finding that "the totality of the circumstances strongly suggested that there was evidence of drug dealing" at the residence when defendant was observed exiting his residence immediately prior to selling drugs).   In this case, the issuing magistrate had far more than a "substantial basis" that probable cause existed.

McCoy argues that the Red SUV was wrongfully towed and impounded, which should justify suppression.   He is wrong.   While impoundment of a vehicle is a seizure under the Fourth Amendment, *Soldal v. Cook County*, 506 U.S. 56, 61 (1992), the automobile exception to the warrant requirement is well-settled.   Under the exception, only probable cause is needed. *See United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (citations omitted). Probable cause applies to automobile seizures, not just searches. *See United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (citing *Chambers v. Maroney*, 399 U.S. 42, 49 (1970). A probable cause search of an automobile

"need not be completed on the shoulder of the road." *United States v. Casares-Cardenas*, 14 F.3d 1283, 1286 (8th Cir. 1994). *See also United States v. Olivera-Mendez*, 484 F.3d 505, 513 (8th Cir. 2007); *United States v. Duguay*, 93 F.3d 346, 353 (7th Cir. 1996) ("The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots.").

Marshall had abundant probable cause to seize the Red SUV, both because McCoy possessed drugs shortly *after* leaving the Red SUV (within one hour), and because a certified drug dog indicated the presence of drugs in the Red SUV. *See United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (holding that, assuming a dog is reliable, a dog sniff resulting in a positive alert for drugs is sufficient for probable cause to search).  Marshall's decision to tow and impound the vehicle in order to do a warranted search of it showed respect for, and surely did not violate the Fourth Amendment.

McCoy argues that probable cause is lacking because "the information about [his] trailblazer was stale," asserting that he sold the vehicle "weeks before the executed warrant." ECF No 76, p. 10.  McCoy's argument fails.  The information about McCoy's trailblazer is included in the affidavit not to show McCoy's nexus to the trailblazer itself, but to show the nexus between McCoy and the Sheridan House.  The fact that McCoy sold the vehicle "weeks before

the executed warrant," if he is to be believed, does not negate that the trailblazer's presence at the Sheridan House, which goes to corroborate the CRI's tip.

Though there was abundant probable cause, if it be found lacking, the derivative evidence should not be suppressed due to Marshall's good faith reliance on the warrants. *United States v. Leon*, 468 U.S. 897, 922-23 (1984).

B. <u>The Sheridan House Warrant was Not Sufficiently Particular.</u>

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except for one 'particularly describing the place to be searched and the persons or things to be seized.' " *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "Multiple circuit courts have held that to satisfy the particularity requirement when a search involves a building with multiple, separate residency units, the warrant must specify the precise unit that is the subject of the search." *United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007). However, "[t]he warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit." *Id.* "The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and disclose, to the issuing Magistrate." *Garrison*, 480 U.S. at 85.

14

The Sheridan House was described as the "Residence at 2939 Sheridan Ave N, Minneapolis, 55411" in the warrant, which was sufficiently described. *See United States v. Palega*, 556 F.3d 709, 713 (8th Cir. 2009) ("[I]t is sufficient that the description of the premises in the warrant is such that the officer can, with reasonable effort, ascertain and identify the place intended, and avoid mistakenly searching the wrong premises."). All indications at the time Marshall applied for the warrant was that the Sheridan House was a 1) single-family dwelling 2) to which both McCoy and Turnage are connected (in McCoy's case, via McCoy's 2002 Trailblazer), 3) both of whom were associated with drug sales (McCoy through the CRI's tip itself, and his association with Turnage; and Turnage through his association with McCoy, and the controlled buy). There was probable cause to search the whole Sheridan House and it was sufficiently particularly described.

McCoy argues that the warrant was not sufficiently particular because officers should have known that the Sheridan House was actually a "boarding house [with] separate units," thereby requiring a separate probable cause analysis for each unit. ECF No. 76, p. 16. In his affidavit, McCoy claims that a call to McCoy's federal probation agent would have resulted in Marshall learning that McCoy "leased a single room." ECF No. 78, p. 3.

McCoy's arguments fall short. First, the fact that there could have been multiple units at the Sheridan House is irrelevant. If McCoy's bedroom was

really a separate unit requiring an independent probable cause determination and judicial authorization, the matter is of *no* consequence to the officers finding a firearm in his Red SUV.  Officers saw McCoy throw suspected cocaine while the officers stood in a location they had a legal basis to be: in a common area.  Officer's gained that information before entering his room under the plain-view doctrine. This information was the basis for the drug dog, which established probable cause to search the Red SUV, where the firearm was found.

Second, McCoy's own offered exhibit does not establish there were "separate units."  His lease lists an address of 2939 Sheridan Ave, with no unit number.  ECF No. 83, Defense Exhibit G.  McCoy's own exhibit goes more to show it was a single-family dwelling than a multi-unit dwelling.

Third, McCoy offers no evidence that Marshall or the other officers executing the warrant should have reasonably believed there were separate units (if indeed there were).  The officers reasonably believed the Sheridan House did not have separate units because all indications point to it not having separate units.  There was one mailbox, one gas meter, and the internal doors the executing officers encountered bore no signs of separate units.[9]  The Eight

---

[9] Pictures of the front of the Sheridan House and internal doors are appended to this pleading as Government Exhibit 1. Page 1 is the front of the Sheridan House. Page 2 is the open door leading to McCoy's room which McCoy exited as officers approached. Page 3 and 4 is the door opposite of McCoy's bedroom.

Circuit has rejected a similar claim.  *See United States v. Nichols*, 344 F.3d 793, 798 (8th Cir. 2003) (finding sufficient particularity when the defendant claimed he lived in a separate unit within a dwelling, because, even though he paid rent and had locked bedroom doors, "there were no markings on his doors listing it as an apartment, it was only a room without a kitchen or bathroom, and the post office did not have any apartments registered at that address."). McCoy puts much weight on Marshall not contacting his federal probation agent.  At best, this probation agent would have said what McCoy avers in his affidavit, which is that he "leased a single room from a boarding house."  ECF 78, p. 3.  If anything, this shows McCoy leased a room in a single-family house, not a multi-unit dwelling.

Fourth, McCoy's theory that the warrant was not sufficiently particular assumes that, while there may have been probable cause to search areas related to Turnage, there was not probable cause in areas where McCoy had a reasonable expectation of privacy. This is mistaken.  The CRI provided information that McCoy dealt drugs and that he stayed with Turnage.  Both of these facts were corroborated through investigation.  The controlled buy further associated the Sheridan House to drug activity.  McCoy ignores that the original CRI tip concerned *his* drug dealing, which supported probable

---

Page 5 is a snapshot of a body camera video worn by an executing officer which captures that moment that McCoy exits his bedroom.

cause to search areas where *he* had a reasonable expectation of privacy. This includes his bedroom within the Sheridan House, *especially* after officers, while standing where they had a legal basis to be, saw McCoy toss a suspected cocaine baggy into a closet.

C. McCoy's *Franks* Arguments Do not Justify a *Franks* Hearing, Much Less Suppression.

McCoy contends that Marshall deliberately or recklessly concealed information from the issuing judge that would have, if disclosed, rendered "[in]sufficient [the] nexus between the alleged criminal activity and the Sheridan Avenue North Residence." ECF No 76, p. 14.

A defendant seeking a *Franks* hearing must make a "substantial preliminary showing." *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004). "[T]o merit a Franks hearing, [a defendant] must show both (1) that the affiant [] 'knowingly and intentionally' made false statements or made them in 'reckless disregard for the truth' and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). "'The requirement of a substantial preliminary showing is not lightly met.'" *Id.* (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)). And "[m]ere allegations of deliberate or reckless falsehoods are insufficient." *Id.* at 899. Accordingly, *Franks* only "protects against omissions that are designed

to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate," *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (emphasis in original) (citing *United States v. Reivich*, 793 F.3d 957, 961 (8th Cir. 1986)).

Here, none of the purported material omissions could reasonably be deemed to have been "designed to mislead" the magistrate. The government takes the asserted omissions one at a time.

1. <u>The Cell Phone Number Ending in 0114</u>. Marshall used this CRI-provided cell phone number to identify the person the CRI knew as "Greg." Using "Clear," Marshall determined that a Gregory Lynn McCoy was "related to" this cell phone number, prompting him to print McCoy's driver's license picture from DVS and prompting, in turn, the CRI to identify McCoy as his/her "Greg." Marshall misled nobody by averring that McCoy was "related to" this number. Marshall swore that McCoy was "related to" this phone number, and the phone number obviously did "relate to" McCoy because it enabled Marshall to find and print McCoy's driver's license photo to show to the CRI. That other people may also have been "related to" the number does not change, undermine or taint Marshall's effective use of the number to identify McCoy as the "Greg" mentioned by the CRI. Further, the process of using the phone number to identify McCoy as the CRI's "Greg" has little to do with the probable cause to

believe that the Sheridan House was being used for drug dealing, which was developed after the CRI's identification of McCoy as "Greg."

2.   The DVS Records.   McCoy criticizes Marshall for not telling the issuing judge numerous pieces of information, including that McCoy's driver's license contained an address in North St. Paul; or that Turnage's driver's license contained an address on Kent Street in Roseville; or that Turnage's Range Rover was registered to a woman living on Tyler Street in Minneapolis. He states that "[t]he affidavit offered no facts whatsoever that 'Mr. Turnage nor Mr. McCoy lived at the [Sheridan House],' or that there was any link between the [Sheridan House] and suspected drug activities."   ECF No 76, p. 14.

Marshall did not mislead the issuing judge.  The purpose of Marshall's affidavit was not to establish where McCoy and Turnage lived, but rather to show that McCoy and Turnage were using the Sheridan House to deal dope. Probable cause did not turn on either man living at in the Sheridan House, and Marshall did not swear that either man did.  Instead, Marshall stuck to the facts known to him, namely, that McCoy's Blazer was registered to the Sheridan House, and Marshall had seen it parked there several times; that Marshall had observed Turnage's Range Rover parked at the Sheridan House; and that Turnage left from and returned to the Sheridan House to sell drugs to the CRI within 72 hours of the warrant's issuance. The entirely

unsurprising fact that DVS data showed that both McCoy and Turnage had had connections with other address is not information Marshall had a duty to relate to the issuing judge, and the failure to do so was not in any way misleading. A "law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Arnold*, 725 F.3d at 898-99 (citing *Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001)).

Finally, the warrant for the Sheridan House would still be supported by ample probable cause to search it for drugs and guns, even if Marshall's assertedly misleading discussion of the DVS records and the cell-phone records were removed from Marshall's affidavit. The general information about McCoy and Turnage provided by the reliable informant, coupled with the controlled sale by Turnage to the CRI within 72 hours of the warrant's issuance, in the course of which Turnage left from and returned to the Sheridan House, provides strong, probable cause support to the warrant, even without the discussion of the DVS and cell phone records. McCoy's possession of cocaine and dog sniff of the Red SUV provided ample probable cause for the follow-on search of the red SUV. Here, because Marshall's affidavits contain plenty of probable cause to search the Sheridan House and the Red SUV, even deleting the information McCoy asserts is misleading, there can be no Fourth

Amendment violation, and McCoy has failed to make the requisite substantial preliminary showing to warrant a *Franks* hearing.

Accordingly, the McCoy's motions to suppress, and for a *Franks* hearing, should be denied.

**7.    Government's Response to McCoy's "Motion for Disclosure of Confidential Informant" (ECF No. 48).**

The government opposes this motion because confidential reliable informant ("CRI") was merely a tipster and disclosure is unwarranted. The government asserts the informant privilege as to the CRI. In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court addressed the privilege. "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59.

The privilege is not absolute and there is no litmus test for determining when disclosure is required. *United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003). The most important factor for a court to consider is whether the informant's information is material to the defense. *Id.* at 764. In circumstances where the informant is an active participant in the conduct charged, the informant's identity is "almost always" material. *United States v.*

*Sanchez*, 429 F.3d 753, 756 (8th Cir. 2005). On the other hand, if the informant is a mere "tipster," there is generally a strong presumption against disclosure. *United States v. Lindsey*, 284 F.3d 874, 877 (8th Cir. 2002).

To overcome the government's privilege, a defendant must establish beyond "mere speculation" that the informant's testimony would be material to the determination of the case. *United States v. Harrington*, 951 F.2d 876, 877 (8th Cir. 1991). To establish materiality, the burden is on a defendant to show that there is a reasonable probability that, if the evidence were disclosed to the defense, the result of the proceeding would be different. *Id.* at 878.

Here, McCoy has provided no basis for this Court to conclude that the disclosure of the CRI's identity would be material to the defense. Because the government has charged McCoy based solely upon the observations and seizures of the police, the CRI is merely a tipster. The CRI was not present at the search. Consequently, the government does not intend to call the CRI as a witness at trial. The government's case is at least one step removed from any observations of the CRI.

The Eighth Circuit has not required the government to disclose the identity of an informant under similar facts. *See, e.g., United States v. Hollis*, 245 F.3d 671 (8th Cir. 2001); *United States v. Harrington*, 951 F.2d 876 (8th Cir. 1991); *United States v. Bourbon*, 819 F.2d 856 (8th Cir. 1987). For example, in *Hollis*, an informant provided information that he had seen drugs

in a residence within the previous 10 days. 245 F.3d at 673. This information led to a search warrant, the seizure of drugs, and charges against *Hollis* for possession with intent to distribute those drugs. *Id.* The defense later produced a witness who claimed that she accompanied the informant to the residence and that neither of them had seen the drugs. *Id.* Holding that disclosure was not required, the Court concluded that the informant was a "tipster" and stated:

> The confidential informant in this case did not participate in the offense charged against Hollis, and the government stated that it did not intend to call the informant as a witness at trial. There was, accordingly, no obligation on the part of the government to reveal the informant's identity.

*Hollis*, 245 F.3d at 674.

Similarly, in *Harrington*, the police used an informant to make controlled buys of drugs from occupants of an apartment. 951 F.2d at 877. Based upon this information, the police obtained a search warrant and seized drugs. *Id.* As a result, various occupants of the apartment were charged with drug-related offenses relating to the possession of drugs. *Id.* The Court found that disclosure was not "vital to a fair trial because the informant's testimony would not further any legitimate interests of the defendants." *Id.* at 878. The Court went on to find that the informant was a "tipster" who alerted police that the defendants were offering drugs for sale. *Id.* The Court noted that even though the informant had engaged in drug transactions and observed drugs in

24

the apartment the day before the search, he "neither witnessed nor participated in the search of the apartment." *Id.* Importantly, the Court relied upon the government's assertion that it did not intend to call the informant to testify. *Id.*

Here, McCoy has offered nothing to support his motion to compel the government to disclose the identity of the CRI. McCoy's motion should be denied.

8. <u>Government's Response to McCoy's "Motion for Early Disclosure of Jencks Material" (ECF No. 79).</u>[10]

The government opposes this motion. The entire thrust of the Jencks act is to relieve the government of any obligation to turn over witness statements until the witness has testified on direct examination. In accordance with its office policy, the government volunteers to turn over its Jencks Act materials not later than three days before trial.

Dated: April 12, 2021                    W. ANDERS FOLK
                                         Acting United States Attorney

                                         */s/ Joseph S. Teirab*

                                         BY: JOSEPH S. TEIRAB
                                         DAVID J. MacLAUGHLIN
                                         Assistant U.S. Attorneys

---

[10] McCoy's "Motion for Early Disclosure of Jencks Material" (ECF No. 79) is substantively identical to his motion previously filed as ECF No. 22, to which the government responded in ECF No. 29.